Filed 10/3/24  P. v. Archer CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN JOSEPH ARCHER II,<br><br>        Defendant and Appellant. | A167050<br><br><br>(Sonoma County Super. Ct.<br> No. SCR7472921) |

A jury convicted defendant Stephen Joseph Archer II of murdering his friend Manuel "Manny" Valdez, who allegedly had admitted sleeping with Archer's wife.  Archer contends the trial court erred by admitting improper lay opinion testimony, as well as hearsay evidence identifying Archer as the killer.  Archer also challenges aspects of his 52 years to life sentence and requests correction of the abstract of judgment.  The People agree the abstract must be corrected but otherwise reject Archer's contentions.  We agree the court did not prejudicially err in its admission of evidence and therefore affirm the judgment of conviction, but we find the record requires remand for the trial court to reconsider whether to strike the firearm-use enhancement and to prepare a new abstract of judgment.

1

## BACKGROUND

### *Evidence at Trial*

Valdez was shot in his home at 5:50 a.m. on June 28, 2021.[1] In the weeks before the murder, Archer sent Valdez many texts accusing him of betraying their friendship by sleeping with Archer's wife Alexie.[2] Two days before the murder, Archer sent Valdez a string of accusatory, threatening texts—culminating in, "You fuck every friend you got over and this friend going to do something about it." The two then spoke by telephone; according to Archer, Valdez admitted the affair and apologized.

As seen on surveillance video, Alexie parked outside Valdez's home shortly before midnight on June 27 and sat in her truck for about 45 minutes. For part of that time, Alexie and Archer argued by text message. Archer texted, "Fuck off alexie edge I am done love u" and claimed to be in bed with another woman. Alexie sent a text that was partly forensically recovered and began, "Again think what you want, I am not having sex wit." Around 12:30 a.m., Valdez walked outside and brought Alexie into the house with him.

Alexie's truck was still in front of Valdez's house at 5:41 the next morning, when someone drove by in a black Mercedes and honked. Archer was known to drive a black Mercedes. Records show about 40 seconds later, Archer's phone connected to a cell tower near Valdez's home. Archer called Alexie, who did not answer. Between 5:43 and 5:44 a.m., Archer texted Alexie, "Back over to f*** Manny some more sheets and dope"; "So lucky I don't feel like going in there with [a] shotgun"; "but one day I might."

---

[1] All dates referenced herein are in 2021.

[2] Because Archer and Alexie Edge-Archer partly share a surname, we refer to her by her first name for clarity, without intending any disrespect.

Seconds later, at 5:44, Archer called Alexie again; this time, his phone connected to a cell tower closer to Archer's house. Alexie did not answer.

At 5:47 a.m., a black Mercedes parked around the corner from Valdez's house. Video surveillance shows the Mercedes appears similar or identical to the black Mercedes that had driven by Valdez's house six minutes earlier. The driver wore a black jacket with a gray hood, black shoes, and a bandana obscuring much of his face. After getting out of the car, the driver retrieved a long gun case from the trunk, walked around the corner to Valdez's house and, at 5:48, walked down Valdez's driveway toward the back of the house. That took him out of view of the security cameras from which video was available.

At 5:50 a.m., the security camera in Valdez's living room, which faced the street, recorded sounds consistent with a person kicking open a door and racking and firing a shotgun, followed by Alexie's distinctively raspy voice yelling, "Hey! Archer! What the fuck are you doing? What are you doing? Stop! Stop! What are you doing? What are you doing? Archer!" Seconds later, the Mercedes driver ran—still carrying the long gun case—back up Valdez's driveway and toward where he had parked. At 5:51, the driver put the case in the car and drove away.

At 5:55 a.m., Archer downloaded an app called Scanner Radio–Fire and Police Scanner. In the next few minutes, he and Alexie had one or two short phone calls. The camera in Valdez's living room recorded Alexie say, "Archer! What? I didn't do anything new. I was your wife! Oh my God, I told you, when we did the one time. I'm not! I am not faithful to him. . . ." At 5:59, Archer texted Alexie, "4 do what you got to do cuz I love you that's why."

At 6:02 a.m., Alexie called Archer from her parked truck; their conversation lasted 34 minutes as Alexie walked in and out of Valdez's house.

At 6:21, Alexie drove away. Over the next hour, Alexie and Archer had five more phone conversations.

That evening, Archer and Alexie picked up Valdez's dog from Valdez's house and brought it to their house. At 3:30 a.m. the next morning, someone rode up to Valdez's house on a bicycle, walked to the back of the house for several minutes, then left. At 4:50 a.m., someone else approached on foot, walked to the back of the house for several minutes, then left. In that period, Archer's and Alexie's phones each connected to a cell tower near Valdez's house.

Around 3:00 p.m. on June 29, Valdez's neighbors Louis Z. and Lauren B. went to Valdez's house to check on him. The doors were locked, so they opened a kitchen window for Lauren to climb in, but she smelled gas and saw an open flame on the stove. The pilot light was on, ringed by crumpled paper. Another neighbor called the fire department, leading to the discovery of Valdez's body. He appeared to have been shot twice with a shotgun—once in the face and once in the chest.

The police searched Valdez's house and found the door from the laundry room to the kitchen had been kicked open. A spent Winchester Super-X shotgun shell lay near Valdez's body, wadding from a Super-X shell was in his chest wound, and two unexpended shells, one a Super-X, were found in the room. A neighbor found four Super-X shells lying "scattered" by the driveway, as if "they had fallen out of somebody's pocket." Two security cameras were mounted at Valdez's house; the kitchen windowsill had an empty bracket for a third. Data on Valdez's phone showed Valdez had had three cameras; the missing one had recorded the driveway down which the killer had approached the back door.

At 5:00 p.m. on June 29, Archer texted Valdez's phone, "it's Archer where are you man?  Look I have your dog I didn't know what else to do."

On June 30, police executed a search warrant at Archer's property and arrested him.  Lying in a pile of junk was a security camera of the same type as those installed at Valdez's house—a type different from those mounted on Archer's property.  Police found an empty box of Winchester Super-X shotgun shells and two Super-X shells, as well as a black jacket with a gray hood and black shoes like those worn by the gunman in the video.

Archer's phone contained evidence suggesting that, within 40 hours of the murder, Archer had sold a shotgun.  On the night of June 28, he texted a friend, "400 for the Mossberg 500."  The next night, someone else messaged Archer asking, "Still got Mossberg"; he replied "No."  His phone contained two photos of a shotgun that a witness opined was a Mossberg 500.

A black Mercedes was parked on Archer's property during the search, but the police did not realize its significance.  It was a "family car" first owned by Archer's mother or father, now registered to Archer's brother-in-law, and driven regularly by Archer.  While officers were searching the property, Archer spoke by phone with his sister, who came to the property and drove the Mercedes away.  When later asked by police, Archer's sister turned in the Mercedes.

Detective Matthew White interviewed Archer after his arrest; the recording was played for the jury.  Archer explained that one of the dogs on his property was "my friend Manny's dog."  Asked if Archer and Alexie were dogsitting for Manny, Archer replied in a stream of consciousness:  "Kind of . . . Lexie's been hanging out with him a lot lately and we've had a lot of problems . . . between me and him and her and they're sleeping together and he's been my friend and there's been like war between him saying they're not

5

sleeping together and, and [unintelligible] so my wife does and I feel that that's just the way it is. And but we've been friends . . . . I've been angry at him and shit, but . . . I just heard from my wife that we didn't know where Manny was." Archer explained that Valdez's neighbors had expressed concern about Valdez's dog being "in the backyard barking all day," so Archer and Alexie had gone to Valdez's house and "pounded on the doors" trying to find Valdez, and they "ended up bringing the dog home."

After Detective White asked if Alexie and Archer had tried to call or text Valdez, Archer said, "I personally didn't try to call him because [unintelligible] a little situation with everything going on. I mean she's sitting there calling him so I didn't . . . . I didn't call or text him until yesterday. I was like dude I have your dog, I don't know what to do . . . . I don't remember the last time I talked to him, we got a lot to talk about, him and my wife sleeping together." Archer said he thought Valdez had been sleeping with Alexie for maybe six months. Asked if he had told Valdez to stop, Archer replied, "we said a lot of mean stuff, but we had talked, it was [June 26]. I just asked him hey man can you just tell me the truth? And that's, did you leave her alone? And he didn't want to. He didn't want to. And then finally just he told me the truth and I said 'Okay.' And the last thing I text[ed] him was I accept your apology, I accept your reasoning."

At trial, Archer called three alibi witnesses who claimed to have been with Archer at his home on June 28: a roommate, a friend who testified he stayed with Archer during a breakup, and a friend who testified he visited for the weekend. All three testified Archer was dull or exhausted the weekend of June 26–27 and mostly lay in bed, detoxing from methamphetamine use; one described him as nearly "bedridden." None testified with specificity as to Archer's whereabouts at the time of the killing.

6

*Verdict and Sentencing*

Archer was charged with three counts—first degree murder (Pen. Code, § 187, subd. (a)),[3] possessing a firearm as a felon (§ 29800, subd. (a)(1)), and possessing ammunition as a felon (§ 30305, subd. (a)(1))—and proceeded to jury trial in September 2022.  The jury found Archer guilty as charged and further found true enhancements for personal and intentional discharge of a firearm, causing death (§ 12022.53, subd. (d)), and lesser included enhancements (*id.*, subds. (b), (c)).  Archer waived jury as to certain other sentencing enhancements and aggravating factors.  In the subsequent bench trial, the court found true six aggravating factors.  Three involved the crime, namely, that it involved great violence, great bodily harm, or cruelty, viciousness, or callousness; involved weapon use; and was carried out in a way indicating planning.  (Cal. Rules of Court, rules 4.421(a)(1), (2), (8).)  The other three aggravating factors related to Archer, namely, that he had engaged in violence indicating a serious danger to society, had numerous or increasingly serious convictions or sustained delinquency petitions, and had served a prior prison term.  (*Id.*, rules 4.421(b)(1)–(3).).  The court found the other sentencing enhancements unproven.

After declining to strike the gun-use enhancement, the trial court imposed a total sentence of 52 years to life.  The sentence comprised consecutive terms of 25 years to life for murder, 25 years to life for the gun-use enhancement (with the lesser-included enhancements stayed), and a middle term of 2 years for possessing a firearm as a felon.  The court also imposed a concurrent term of 2 years for possessing ammunition as a felon.

---

[3] All undesignated statutory references are to the Penal Code.

7

## DISCUSSION

### I. There Was No Prejudicial Error in the Admission of Evidence

Archer contends the trial court prejudicially erred in admitting two forms of evidence: (1) lay opinion testimony by Detective White that the shotgun depicted in two photos on Archer's phone was a Mossberg 500, and (2) hearsay testimony by Louis that, after watching security video of the gunman walking by Louis's house, "*we* assumed that it was [Archer]." (Italics added.) Archer further contends the cumulative prejudice from the combined errors requires reversal. We disagree and address each argument in turn.

The application of "ordinary rules of evidence does not implicate the federal Constitution," so we review whether state-law evidentiary error was prejudicial under the " 'reasonable probability' standard of *People v. Watson* (1956) 46 Cal.2d 818, 836." (*People v. Harris* (2005) 37 Cal.4th 310, 336.) Under that standard, an error warrants reversal only if, after examining " 'the entire cause, including the evidence,' " we find it "reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (*Watson*, at p. 836.) Archer notes "criticism" of the application of the *Watson* standard to state evidentiary error (*People v. Cudjo* (1993) 6 Cal.4th 585, 641 (dis. opn. of Kennard, J.)), but he does not dispute that *Watson* binds this court, and he has not shown any additional basis for error. (See *People v. Shah* (2023) 96 Cal.App.5th 879, 894, fn. 5 [" 'Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review' "]; Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "support each point by argument and, if possible, by citation of authority"].)[4]

---

[4] In his opening brief, Archer argued that the admission of Louis Z.'s testimony triggered the stricter prejudice standard applicable to errors of federal constitutional law (*Chapman v. California* (1967) 386 U.S. 18, 24), as

**A.** *Admission of White's Lay Opinion Testimony Was Neither Erroneous nor Prejudicial*

Matthew White testified several times in the course of the trial as the detective in charge of the homicide investigation. But in expressing an opinion that the shotgun shown in photos on Archer's phone was a Mossberg 500—i.e., the type of shotgun Archer sent texts about selling— White testified as a layman who, in his personal capacity, is familiar with shotguns—he uses them to shoot clay pigeons—and who owns two: a Mossberg 500 and a Remington 870.

As explained by our colleagues in Division Five, lay opinion testimony is admissible " ' "as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them . . . in any other manner.' " ' " (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.) A lay opinion must be "rationally based on the perception of the witness" and "helpful to a clear understanding of [the witness's] testimony." (Evid. Code, § 800, subds. (a), (b).) Examples include lay opinions that someone was intoxicated or angry or driving at an excessive speed, each of which "conveys information to the jury more conveniently and more accurately than would a detailed recital of the underlying facts."

---

the error violated his right to confront witnesses (*Crawford v. Washington* (2004) 541 U.S. 36, 51). But at trial, as the People noted in their response brief, Archer objected to Louis Z.'s testimony only on hearsay grounds, not under the confrontation clause, so he forfeited his constitutional claim. (*People v. Riccardi* (2012) 54 Cal.4th 758, 801 [defendant forfeited claim by objecting "purely on state law grounds" with "no mention of any confrontation clause . . . violations"], overruled on other ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Archer's reply brief does not dispute the point, so he has implicitly conceded it. (*Campbell v. Ingram* (1918) 37 Cal.App. 728, 732 [appellant "has not deigned to reply" to respondent's argument, so we may assume appellant deems argument "unanswerable"].)

(*Chapple*, at p. 547.)  Put differently, if the facts underlying an opinion " ' " "cannot be made palpable to the jurors so that their means of forming opinions are practically equal to those of the witnesses, [lay] opinions of such witnesses may be received.' " ' " (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112–113 (*Osborn*).)  The admissibility of lay opinion is " ' "a matter resting largely in the discretion of the trial court," ' " the exercise of which is rarely reversed on appeal.  (*Id.* at p. 112.)

As the owner of two pump-action 12-gauge shotguns—a Mossberg 500 and a Remington 870—White testified that the "popular" and "widely available" Mossberg 500 has two "distinct features" that distinguish it from other shotguns, including the Remington 870.  The Mossberg 500's safety selector switch is located on top of the shotgun, where "you can push it forward or back with your thumb," whereas the Remington 870's selector switch is a push button "within the trigger well or on the side of it."  In addition, there are "subtle differences in where the screws holding the frame together are" on a Mossberg 500 vis a vis a Remington 870.  Archer did not object to this foundational testimony.

Archer did object, however, to White opining as to the type of shotgun seen in the photos recovered from Archer's phone.  The court overruled Archer's "foundation" and "speculation" objections by deeming the testimony "lay opinion."  White then testified that "Based on my own experience with my own Mossberg 500," the shotgun in the photos was a Mossberg 500 with an aftermarket stock.  White identified, in the photos, the two distinctive parts of the Mossberg 500:  the safety selector switch "on the top . . . manipulated by pushing it either forward or back" and the distinctive set screws that "although it's very subtle, . . . are in a different location than [on

10

shotguns from] other manufacturers."  White noted that, on the printout of the second photograph, "[y]ou can see the dots" where the screws are.

On cross-examination, when asked if he was "100 percent sure it's a Mossberg 500" and if "those two features distinguish it from any other shotgun in the world," White answered "yes."  Defense counsel then asked White if he was aware that a "replica" shotgun called the "Maverick" is "exactly the same as the Mossberg shotgun in terms of rivets and safety."  White said he was not.  On redirect—after lunch—White testified he had googled the Maverick shotgun and, by reviewing images online, had determined that the "safety selector switch on the Maverick Model 88 which was the Mossberg 500 replica model . . . is still located on the trigger well."  He affirmed that he believed the photos on Archer's phone were of a Mossberg 500.

Archer now contends the distinctive features of a Mossberg 500 are "not so numerous, complex, or subtle" that White could not simply have identified the facts supporting his opinion and left it to the jury to decide if the shotgun in the photos was a Mossberg 500.  (See *People v. Sergill* (1982) 138 Cal.App.3d 34, 40 [" 'Whenever feasible "concluding" should be left to the jury' "].)  We disagree.  For example, in *Osborn*, *supra*, 224 Cal.App.3d 104, the plaintiff gave a lay opinion about whether the dangerousness of a construction site was " 'open and obvious.' "  (*Id*. at pp. 110–111.)  In affirming, the Court of Appeal stated that "A recitation of the size of the area, the depth and quality of the dirt, the size of the concrete pieces and whether and in what proportion they were totally exposed, completely hidden, or partially embedded in the dirt . . . would not make the obviousness of the risk involved so palpable to the jury that its means of forming an opinion would be practically equal to those of the witness." (*Id*. at p. 113.)  The same is true

11

here: Even if White could have detailed exactly where each screw is on a Mossberg 500, a recitation of the relevant measurements would only have confused jurors, not given them the same ability to form an opinion whether the shotgun in the photos was a Mossberg 500. While the distinctive features White noted were few in number and not highly complex,[5] that did not make them easy for a jury to understand by itself, such that the court abused its discretion in deciding lay opinion testimony would be helpful. (Evid. Code, § 800.)

Finally, even if admitting White's opinion about the make and model of the shotgun in the photos was improper, it is not "reasonably probable" the trial would have had a different outcome absent that testimony. (*Watson, supra*, 46 Cal.2d at p. 836.) The lay opinion's probative effect on the issues to which it related—whether Archer possessed and tried to sell a shotgun—was slight. (As discussed in the cumulative error discussion below, the contribution of White's lay opinion to the totality of the evidence of guilt was trivial.)

It was undisputed at trial that the photos came from Archer's phone; that the item they depicted was a shotgun; and that Valdez was killed by shotgun blasts. The only dispute concerned circumstantial evidence suggesting Archer had sold a Mossberg 500 shotgun shortly after the homicide and if the make and model of the shotgun shown in the photos was a Mossberg 500. But there was no ballistic evidence that the shotgun shells

---

[5] Archer's claim that White was unable to point out the distinctive features of the Mossberg 500 in the shown photographs mischaracterizes the transcript. White explained that the "printed version" of one photograph was somewhat unclear, but "viewed on a screen this photo appears clearer," rendering the identifying marks of the Mossberg 500 visible. This explanation further supports the value of White's lay testimony.

that killed Valdez were fired by a Mossberg 500. The photographs' presence on Archer's phone was incriminating insofar as it tended to show Archer possessed the type of firearm that had been used to kill Valdez: a shotgun. The make or model is insignificant. White's lay opinion that the photos depicted a Mossberg 500 served only to bolster the link between the photos and Archer's messages about selling a "Mossberg 500." Because there was no evidence as to the model of shotgun used in the homicide, it is not reasonably probable that exclusion of White's limited testimony could have significantly affected the jury's view of the shotgun-related evidence from Archer's phone—let alone its verdict based on all the evidence against Archer.

## B. *Admitting Louis's Hearsay Testimony Was Harmless Error*

Archer contends the trial court abused its discretion by overruling his hearsay objection to testimony by Valdez's neighbor Louis concerning the identity of the person seen on the surveillance videos. In the exchange at issue, Louis described how he and several others, while watching video from Louis's security camera of the gunman walking toward Valdez's house, agreed that the gunman walked like Archer. We conclude the challenged testimony was inadmissible hearsay, but it is not reasonably probable the jury would have reached a different verdict had the testimony been stricken, so the error was harmless.

At trial, the district attorney played a video of the gunman walking by Louis's house and asked Louis, "When you watched that video, did you identify the person who was walking in that video?" Over objection, Louis answered, "No." The district attorney asked again, "Okay. The subject in the video that was walking by, you didn't recognize that person?" Concurrent with a sustained "asked and answered" objection, Louis repeated, "No." The district attorney then asked a series of questions concerning Louis's transmission of the surveillance videos to the police and inquired, "[A]nd

what did you tell the officer when he asked you if you recognized the person in the video?" Over hearsay and relevance objections, Louis was permitted to testify, "I said, by the way the person walked, we assumed that it was the defendant." The people referred to as "we" were, "Me, my wife, a few other people that—[Lauren]—lived at the house. . . . One of my other friends who knows the defendant longer than I ever did." The rest of Louis's direct examination concerned his personal experience with Archer, Archer's "distinct walk," and Louis's courtroom identification of Archer.

On appeal, Archer contends that the court should have excluded as hearsay not within any exception Louis's statement, "by the way the person walked, we assumed that it was the defendant" and his listing of the persons who made up the "we." In stating "we assumed," Louis is offering for their truth the out-of-court statements of others concluding that the person seen in the videos carrying a long gun case was Archer. (Evid. Code, § 1200, subd. (a).)

We agree the comments were hearsay. The People do not contend the comments were admissible under any exception to the hearsay rule. Instead, they argue "we assumed" does not present an out-of-court statement; since Louis did not elaborate or provide context, Louis's "assumption" could have been his own independent presumption of the opinions of the others without them having made specific "statements" or "assertions." But for hearsay purposes, an out-of-court statement need not be verbal. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1161, citing Evid. Code, § 225, subd. (b) [hearsay "statement" can include nonverbal conduct intended by actor as substitute for verbal expression].) The People's argument overextends the plain language of the record.

14

The People then argue that the challenged statement was uttered in response to a series of questions intended to elicit Louis's *own* conclusion as to identity and how he reached it, not to elicit hearsay statements of others. But whether a witness's answer to a question is hearsay depends on the content of the answer and any limiting instructions as to its use, not the original intent of the attorney in asking the question. Moreover, the district attorney could have clarified, in response to the objection, that they were offering the statement not for its truth but rather to show how Louis came to his conclusion—or some other arguably nonhearsay purpose. Or the district attorney or court could have directed Louis to testify as to his own personal belief and admonished him not to refer to any statements of others. But neither of these things happened. Instead, the record remains with the unqualified "by the way the person walked, we assumed that it was the defendant." As such, the statement is inadmissible hearsay.

However, we agree with the People that this error is harmless; it is not reasonably probable the jury would have reached a different verdict had the trial court stricken the improper testimony. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Considered in light of the overwhelming totality of the evidence of guilt, as set forth in the cumulative error discussion below, this limited testimony was of trivial weight. First, although the improper testimony bolstered the identification of Archer—suggesting that multiple people recognized him as the person carrying the long gun case—Louis's vague and non-specific identification testimony as a whole was of limited value, particularly when he acknowledged not having independently recognized Archer on the surveillance video. Louis's group assumption was further undermined during cross-examination: Louis confirmed the sole basis for his identification was the gunman's walk, agreed his view was an "assumption"

15

of something he did not "definitely know" and had "no evidence to support," and admitted that, by the time he and others watched the video, they had already come to suspect Archer. Moreover, the district attorney only minimally relied on the other person's views to persuade the jury. After the exchange quoted above, the district attorney questioned Louis only about his personal basis for identifying Archer. And in his closing argument, the district attorney referred only twice to Louis's identification; neither comment alluded to anyone else's view.

### C. *The Overwhelming Evidence of Archer's Guilt Precludes Any Finding of Prejudice, Cumulative or Otherwise*

Archer contends the cumulative prejudicial effect of the two claimed evidentiary errors compels reversal. (*People v. Hill* (1998) 17 Cal.4th 800, 844 [individually harmless errors can "by accretion" make trial unfair], overruled on other ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Because we conclude the trial court made only one error, we necessarily reject his claim. (*People v. Grimes* (2016) 1 Cal.5th 698, 737 [court "found only one error" so "there is nothing to cumulate"].) But even if we agreed that admission of the lay opinion testimony was also error, we would readily conclude the cumulative effect of the two errors fell far short of causing prejudice under *Watson*, *supra*, 46 Cal.2d at page 836, particularly in view of the overwhelming evidence of Archer's guilt.

First, neither asserted error undermines the powerful evidence of motive—Archer was upset that his "friend" Valdez had slept with his wife—corroborated by Archer's own overt, repeated threats, such as: "You made it this way playing both sides and lying to me now every time it's on"; "[y]ou can spit[ ] blood or spill the beans without[ ] your[ ] teeth"; "you des[erv]e whats coming"; "If she brings m[y] son to your house and you let them in it won't be

16

pretty"; "Fin[e] homeboy lets play then"; and "You fuck every friend you got over and this friend going to do something about it."

Second, Archer's own conduct demonstrated his consciousness of guilt. Five minutes after the shooting, Archer downloaded a police scanner app. Circumstantial evidence further suggested that, after the murder, Archer stole the security camera that had recorded activity in Valdez's driveway, had Alexie set a fire in Valdez's kitchen, took Valdez's dog to his house so its barking would not draw attention, sold a shotgun, and had his sister drive the incriminating black Mercedes off his property. Finally, when Detective White interviewed him, Archer repeatedly gave nonresponsive answers betraying his hostile preoccupation with his deceased rival.

Most significantly, nothing about the asserted errors impacts the unassailable video evidence independently demonstrating that Archer was the gunman captured on security cameras, visually or auditorily, just before, during, and after the killing. Nine minutes before the murder, a black Mercedes matching Archer's drove by Valdez's house and honked; seconds later, Archer used his cell phone in the immediate vicinity of Valdez's house. Two minutes later, Archer texted Alexie, "So lucky I don't feel like going in there with [a] shotgun," "but one day I might." Seven minutes after that, the driver of the Mercedes went in Valdez's house with a shotgun and murdered Valdez, using shells matching ones found on Archer's property, as Alexie yelled, "Hey! Archer! What the fuck are you doing? . . . Stop! . . . Archer!" It is fanciful to suggest that, but for the two bits of evidence at issue, it is reasonably probable a juror would have had a reasonable doubt as to who shot Valdez.

17

## II. Remand for the Trial Court to Consider Future Dangerousness in Imposing or Striking the Firearm-Use Enhancement

Archer claims that at sentencing the trial court erred or abused its discretion in three ways:  (1) imposing separate prison terms for murder and for possessing the firearm used to commit the murder (§ 654); (2) imposing the middle term for possessing a firearm as a felon; and (3) declining to strike the firearm-use enhancement.  We disagree with Archer's first two arguments but agree that the matter should be remanded for the court to demonstrate is has considered Archer's future dangerousness in deciding whether or not to impose the firearm-use enhancement.  (*People v. Gonzalez* (2024) 103 Cal.App.5th 215, 229–231 (*Gonzalez*).)

### A. *Punishments for Both Possessing a Firearm and Murder*

Section 654 bars " ' "multiple punishment for a single act or for a course of conduct comprising indivisible acts.  'Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor.'  [Citations.] '[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.' " ' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)  But a defendant with " 'multiple or simultaneous objectives, independent of and not merely incidental to each other, . . . may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' " (*Ibid.*)

Archer concedes the correctness of the trial court's factual findings that he possessed the shotgun both before and after the murder.  The court concluded that Archer's possession of the shotgun was "separate and independent [of] the murder" for purposes of section 654; Archer disputes that determination.  Whether a defendant harbored multiple criminal

18

objectives is a question of fact, the trial court's determination of which must be upheld on appeal if supported by substantial evidence. (*People v. Nubla* (1999) 74 Cal.App.4th 719, 730.) We review the determination in the light most favorable to the People and presume the existence of every fact the court "could reasonably deduce from the evidence." (*Jones*, *supra*, 103 Cal.App.4th at p. 1143.)

Construing a predecessor of section 29800, our Supreme Court held that whether a violation " 'constitutes a divisible transaction from the offense in which [a felon] employs the weapon' " depends on the facts of each case. (*People v. Bradford* (1976) 17 Cal.3d 8, 22 (*Bradford*).) A court may punish both offenses if the evidence shows " 'a possession [of the gun] distinctly antecedent and separate from the primary offense,' " but not if the evidence shows " 'a possession only in conjunction with the primary offense.' " (*Ibid.*, quoting *People v. Venegas* (1970) 10 Cal.App.3d 814, 821 (*Venegas*).) *Bradford* addressed the latter: a defendant, stopped for speeding while fleeing a crime, grabbed an officer's gun and promptly used it to shoot at the officer. (*Bradford*, at p. 13.) The court held the possession of the gun was indivisible from the assault using the gun. (*Id.* at p. 22.)

Archer contends that his possession of a shotgun and the murder were indivisibly incident to one objective: to kill Valdez. Archer notes there was no evidence of when he obtained the shotgun before he arrived at Valdez's house with the gun in his trunk, 9 minutes before the murder, and evidence showed he got rid of the gun within 48 hours after the murder. Thus, Archer argues, there was "no evidence of meaningful possession separate from the course of the murder." We disagree.

Archer's reliance on *Venegas*, *supra*, 10 Cal.App.3d 814, and *People v. Burnett* (1967) 251 Cal.App.2d 651 (*Burnett*), is not persuasive. In *Venegas*,

the defendant and a friend sat in a bar drinking until, suddenly, witnesses heard shots and saw the defendant with a gun. (*Venegas*, at pp. 817–819.) The victim testified a third party produced the gun; no evidence showed how long before the shots the defendant possessed the gun; and the defendant dropped the gun as he fled. (*Id.* at pp. 818–820.) The Court of Appeal held "the evidence shows a possession only at the time defendant shot [the victim]," which was not separately punishable. (*Id.* at p. 821.) In *Burnett*, the defendant approached a bar at closing time, spoke to a bartender trying to lock up, then drew a gun and said, " 'This is a stickup.' " (*Id.* at p. 653.) After a struggle over the gun, he fled. (*Ibid.*) In its opinion, Division Three recited no other facts and noted it had raised the section 654 issue itself. (*Burnett*, at pp. 653–654.) Its analysis comprised only general principles of section 654 law and this statement: "The possession and use of the revolver at the time of the robbery . . . was indivisible from the attempted robbery." (*Burnett*, at p. 658.)

*Venegas* is distinguishable on its facts, *Burnett*'s truncated analysis predated *Bradford*, *supra*, 17 Cal.3d 8, and later decisions clarify the application of section 654 to a case like this. (*Jones*, *supra*, 103 Cal.App.4th at pp. 1144–1149; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401 (*Ratcliff*).)

In *Ratcliff*, the defendant used a gun to commit two robberies an hour and a half apart; the defendant already had the gun "when he arrived at the scene of the first robbery," and he still had it when he was arrested half an hour after the second. (*Ratcliff*, *supra*, 223 Cal.App.3d at p. 1413.) The Fourth District distinguished *Bradford* and *Venegas* as holding only that "if the evidence demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense," section 654 applies. (*Ratcliff*, at p. 1412.) After dismissing *Burnett*

20

because it "simply failed to address the issue of prior or subsequent possession," the *Ratcliff* court upheld the sentence. (*Id.* at pp. 1412–1413.)

In *Jones*, *supra*, 103 Cal.App.4th 1139, a friend drove the defendant by a house, at which he fired several shots. (*Id.* at p. 1142.) The Second District applied and elaborated the rule of *Ratcliff*: "We conclude that, when an ex-felon commits a crime using a firearm, and arrives at the crime scene already in possession of the firearm, it may reasonably be inferred that the firearm possession is a separate and antecedent offense, carried out with an independent, distinct intent." (*Jones*, at p. 1141.) The court noted that Jones "necessarily had the firearm in his possession *before* he shot at [the] house"; there was no evidence he "mysteriously happened to discover the loaded gun in the car while driving past the house." (*Id.* at pp. 1147, 1148.)

Archer contends that, while he possessed the gun for some minutes before the killing, he did so with no intent other than to murder Valdez, so the mere passage of time between possession and murder cannot make the crimes separately punishable. Recent authority weighs heavily and consistently against this argument. (See *People v. Vang* (2010) 184 Cal.App.4th 912, 916 [following *Ratcliff* and *Jones*], implicitly overruled on another point as noted in *People v. Washington* (2021) 61 Cal.App.5th 776, 791; accord, *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217, called into doubt on another ground by *People v. Calderon* (2013) 214 Cal.App.4th 656, 666–667); *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565.) But we need not assess Archer's argument that his possession of the shotgun *before* the murder cannot be separated from the murder for purposes of section 654, for Archer concedes he possessed the shotgun *after* the murder. If Archer's sole objective in possessing the shotgun had been to kill Valdez, he would have had no need to retain possession once he had done so. The evidence supports

21

implied findings that Archer retained possession with two objectives distinct from killing Valdez. First, as the People note, Archer's offer to sell the gun revealed an objective of using the gun to obtain money. Second, the evidence supports an inference that, in maintaining possession and trying to sell the gun, Archer sought to dispose of evidence and avoid prosecution. (See *People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1006 ["the objective of the robbery was to obtain money from the bank, while the objective of the evading arrest by reckless driving was to avoid being caught by the police"].)

### B. *Imposing a Middle Term for Possessing a Firearm as a Felon*

In imposing a middle term for possessing a firearm as a felon, the trial court relied on three aggravating factors: Archer's numerous or increasingly serious convictions and sustained delinquency petitions, his service of a prior term in prison or county jail (§ 1170, subd. h)), and his poor performance on probation. (Cal. Rules of Court, rule 4.421(b)(2), (3) & (5).) Archer contends the court abused its discretion in selecting the mid-term because he submitted evidence he was abused as a child, and a court must impose the lower term if "psychological, physical, or childhood trauma, including . . . abuse" was a "contributing factor in the commission of the offense," unless the court finds that "aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6) & (A).) We disagree.

Section 1170 does not create a presumption in favor of a lower term any time there is a suggestion of childhood abuse or trauma; rather, the presumption applies "only if the [condition] was 'a contributing factor' in [the] commission of the offense." (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 992 (*Fredrickson*) [youth].) Thus, "to trigger the presumption, there must be some initial showing that the [condition] was a contributing factor." (*Ibid.*) Here, after Archer's lawyer filed a sentencing brief, he received letters from

22

Archer's sister and stepfather disclosing that Archer's father had abused him. The lawyer submitted copies on the day of the hearing and offered, "I wish I had more time to be able to develop that information further to the court, but I don't." He used the letters to support Archer's request to strike the firearm enhancement and to raise abuse as a mitigating factor in sentencing (Cal. Rules of Court, rule 4.423(b)(3)). He did not contend the letters triggered a lower-term presumption (§ 1170, subd. (b)(6)).

Archer thus did not make a sufficient initial showing to trigger the lower-term presumption. (*Fredrickson, supra*, 90 Cal.App.5th at pp. 992–993.) Because Archer's challenges to the mid-term rest on an assumption the presumption was triggered, they fail. In any case, if Archer meant to contest the trial court's exercise of its discretion, without regard for the lower-term presumption, the record amply supports the court's decision based on the aggravating factors it found. Archer has not developed an argument that any such finding was erroneous.

C. *Declining to Strike the Firearm Enhancement*

Section 12022.53 creates "a tiered system of sentencing enhancements for specified felonies involving firearms." (*People v. Tirado* (2022) 12 Cal.5th 688, 692 (*Tirado*).) Section 12022.53, subdivisions (b), (c), and (d) mandate enhancements of 10 years for personally *using* a firearm in such a felony, 20 years for personally and intentionally *discharging* a firearm, and 25 years to life for doing so in a way *causing great bodily injury or death*. (*Tirado*, at p. 695, citing § 12022.53, subds. (b)–(d).) Courts may strike such enhancements in the interest of justice. (*Tirado*, at pp. 695–696; § 12022.53, subd. (h).)

But in 2021, the Legislature amended section 1385, which generally governs a trial court's discretion to strike sentencing enhancements, to enumerate a list of nine circumstances, "the presence of one or more of

23

[which] weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) The statute defines "endanger public safety" to mean "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (*Ibid.*)

Here, the jury found true allegations supporting all three section 12022.53 enhancements, and Archer urged the trial court to strike all three, invoking two of the nine enumerated circumstances: the enhancement could yield a sentence of over 20 years, and his offense was "connected to prior victimization or childhood trauma." (*Id.*, subd. (c)(2)(C) & (E).)

Noting that the amendment of section 1385 was "new law to all of us," the court expressed doubt that the "sentence over 20 years" factor applied but found that, even if it did, "dismissal of the enhancement would endanger public safety." Given the nature of the crime, the court opined, it is "likely that Mr. Archer when angered or wronged will take out [his anger by inflicting] harm on someone else." While Valdez's affair with Alexie afforded some mitigation, Archer had not found the two in bed in his own home; he made and executed a plan to hunt down Valdez in *his* home. The court found the crime caused Valdez a moment of "terrified fear" when he heard his door kicked in and a shotgun racked, and further terror if he survived the first shot. Archer did not acknowledge wrongdoing or responsibility until the sentencing hearing, and the probation report noted he had assaulted an inmate while being held in custody. The court deemed it "regrettable" that "Archer's upbringing was claimed to be less than desirable" but added, "I still don't think Mr. Archer has figured out where the actual loss is in this case." Thus, the court declined to strike the section 12022.53, subdivision (d),

24

enhancement of 25 years to life and stayed sentencing on the lesser included enhancements.  (§ 12022.53, subd. (f).)

We review for abuse of discretion both a decision not to strike an enhancement and a determination that to do so would endanger public safety. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)  Our review is "guided by two fundamental precepts.  First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary." ' [Citations.] . . .  Second, a ' "decision will not be reversed merely because reasonable people might disagree. . . .' " ' [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 376– 377.)  A trial court also abuses its discretion if it bases a discretionary decision "on an incorrect legal standard." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

In his opening and reply briefs, Archer contends the trial court abused its discretion because the record does not support its asserted view "that Archer settles disputes with a gun."  Archer represents that none of his 14 convictions or sustained juvenile petitions was for perpetrating or threatening gun violence.  But two of the convictions were for possessing guns or ammunition, and section 1385 does not require a court to find a likelihood that dismissing a *gun-use* enhancement will result in *gun* violence; a court need only find a likelihood that dismissal will result in "physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)  That is what the court found.

However, prior to oral argument, Archer augmented his position, notifying this court of the Fourth District's recent decision in *Gonzalez*,

25

*supra*, 103 Cal.App.5th 215—also concerning whether the amendments to section 1385 warranted striking an enhancement imposed under section 12022.53, subdivision (d)—and its clarification that an assessment of danger upon release rather than danger at the time of sentencing is required: " 'in determining whether [a defendant] poses an unreasonable risk of danger, the trial court must look to when he would be released if a modification is granted.' " (*Gonzalez,* at pp. 222–223, quoting *People v. Williams* (2018) 19 Cal.App.5th 1057, 1063 [petition under § 1170.126 to resentence third-strike defendant].)

Here, while the trial court used the predictive verbs "would" and "will," it is not clear from the record as a whole that the court considered Archer's dangerousness at the time of his earliest potential release date in 27 years (excluding custodial credits), as compared to 52 years if the enhancement was imposed. Accordingly, we remand for the trial court to reconsider whether to exercise its discretion under section 1385, subdivision (c), to strike the section 12022.53, subdivision (d) firearm-use enhancement, taking into account Archer's risk of danger in the future, at the alternate potential release dates with or without the enhancement. If the trial court exercises its discretion to strike the enhancement, it may conduct a full resentencing, in which event it may reassess what term to impose for possessing a firearm as a felon (see part II.B, *ante*), whether to impose, strike, or stay the lesser included firearm-use enhancements (§ 12022.53, subds. (b)–(c)), and every other "aspect of the sentence" (*People v. Buycks* (2018) 5 Cal.5th 857, 893), subject to the rule that the court may not impose an aggregate sentence on remand greater than the one Archer initially received (*People v. Henderson* (2022) 14 Cal.5th 34, 56). If the trial court declines to strike the section 12022.53, subdivision (d) enhancement after reconsidering the matter in light of

26

*Gonzalez, supra*, 103 Cal.App.5th 215, then its original sentence shall remain intact. (See *People v. Walker* (2021) 67 Cal.App.5th 198, 204–205 ["If the appellate court's order upon remand grants the trial court discretion whether to resentence and the court elects not to do so and leaves the prior sentence intact, there is no resentencing *at all*—and hence no need to address other possible errors in the sentence"], citing *People v. Ramirez* (2019) 35 Cal.App.5th 55, 63.) We express no view as to how the trial court should exercise its discretion on remand under section 1385, subdivision (c).

### III. *The Abstract of Judgment Must Be Corrected in Any Event.*

The parties agree, as do we, that the trial court must on remand correct the abstract of judgment by deleting the checkmark indicating Archer was sentenced "pursuant to PC 667(b)–(i) or PC 1170.12"—i.e., as if he had a prior strike conviction. This checkmark is in error. Accordingly, after the trial court determines whether to strike or leave in place the section 12022.53, subdivision (d) enhancement and, whether or not to conduct any further resentencing it is directed to prepare a new abstract of judgment reflecting the above correction.

### DISPOSITION

The judgment of conviction is affirmed, but the matter is remanded for the trial court to consider whether to strike the section 12022.53 enhancement or not. In any event, the clerk is directed to prepare an amended abstract of judgment that does not indicate "Defendant was sentenced pursuant to PC 667(b)–(i) or PC 1170.12," and to forward a certified copy to the Department of Corrections and Rehabilitation.

27

_____
DESAUTELS, J.

We concur:

_____
RICHMAN, ACTING P. J.

_____
MILLER, J.

*People v. Archer II* (A167050)